**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

TARA JEAN VAUGHN,         )
                                  )
            Plaintiff,     )
                                  )
            v.               )       1:21CV960
                                  )
TRACY NORWOOD, NP, and WASI HAQ,  )
                                  )
            Defendants.    )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned Magistrate Judge for a recommendation on the Motion for Summary Judgment filed by Defendants Tracy Norwood, NP, and Wasi Haq (collectively, "Defendants") (Docket Entry 43). (See Docket Entry dated Feb. 2, 2024.) Because the record establishes Defendants' entitlement to judgment as a matter of law, the Court should grant the instant Motion.

INTRODUCTION

Via the Second Amended Complaint,[1] Plaintiff has asserted a claim under 42 U.S.C. § 1983 for "8th Amendment Cruel and [U]nusual Punishment" (Docket Entry 20-1 at 3),[2] against Defendant Norwood (without specification of either individual or official capacity)

_____

1 The Court (per the undersigned Magistrate Judge) previously "deem[ed the] Second Amended Complaint as the operative pleading in this case . . . ." (Text Order dated Jan. 19, 2023.)

2 Pin cites to Docket Entries refer to the page numbers that appear in the footer appended thereto upon docketing in the CM/ECF system (not any original pagination).

and against Defendant Haq (in his individual capacity) (see id. at 2; see also id. (identifying Defendants Norwood and Haq as "Health Provider at County Jail" and "Health Care Provider at County Jail," respectively)), based on "event[s which] happened in [the] Greensboro County Jail . . . [in] Oct[ober 20]19" (id. at 4; accord id. at 5). Specifically, the Second Amended Complaint alleges:

> [Defendants] knew that [Plaintiff] was a [d]iabetic and that the orders the hand [d]octor from the [h]ospital sent should not be[] changed. [Plaintiff's] hand was suppose[d] to be washed & changed 2X daily and the order was changed to every 48 hours which wasn't being change[d] then. And they would put refused everytime [sic] they didn't change it and nobody ever ask[ed] why.

(Id. at 4 (emphasis added).)

The Second Amended Complaint elaborates:

> [Plaintiff] came to [the] Greensboro Jail with 4 stitches in [her] finger due to a fight. The [h]and [d]octor from [the] hospital sent strick [sic] orders [to] wash and change [Plaintiff's] badges [sic] twice daily because [she is] a [d]iabetic, and to continue to take [th]e rest of [her] antibiotics[,] which in [the r]ecords states [her] infection was clearing up when [she] left [the] hospital. [On]ce [she r]eturn[ed] to [j]ail all orders w[ere] changed as well as medications, [at] which [point her] hand [sta]rted tak[ing] a turn for the worse. They w[ere]n't changing [her] banges [sic], and [were] saying [she] refuse[d]. Infection started setting in and [she] had to go back to [the] hospital in surgery. [The s]ame thing [ha]ppen[ed] when [she] got back to [the] jail. [The n]ext time [her] finger couldn't be saved.
>
> * * * * *
>
> [Plaintiff] lost [her] finger due to neglect[. She] was suppose[d] to [have] been checked on daily. Bandages & hand [were to be c]hanged twice a day [d]ue to the fact [she] was a [d]iabetic, [but] they didn't d[o] what [the] [d]octor said [to] d[o and her] medication was changed. The doctor at [the h]ospital stated in [r]ecords that

2

> before leaving [the] hospital [the] infection was
> clearing up & that once back to [the] jail he don't [sic]
> know what happened why [the] infection continue[d] to
> accure [sic]. [Plaintiff] stayed in pain daily[ and she]
> even decided to kill [her]self because [she] couldn't
> take it no [sic] more.
>
> * * * * *
>
> [Plaintiff] ask[s] the Court[] to grant [her] 3 million
> dollars for all [her] pain and suffering, [as well as]
> th[e] fact that [she] can no longer use but 2 fingers
> [on] her hand due to damages of infection. . . . [She
> is] no longer able to work because [she is] right handed
> and [she] cant [sic] use [her] hand anymore due to nerve
> damages.

(Id. at 5 (emphasis omitted and added)); see also id. at 8 ("When

the nurse would come to pass medication[, Plaintiff] would [ask]

w[as] there anybody coming to clean and change [her] badges [sic],

[and she] was told answers like, 'if we have time' or 'I'll pass it

to next chief[,'] which [Plaintiff] wouldn't get it done, [and she]

was being put down as Refuse on medical [r]ecords which [she] never

Refused!!" (parentheses omitted)).)

Defendants (A) answered, denying therein the material

allegations within the Second Amended Complaint (see Docket Entries

26, 27), and (B) moved for dismissal under Federal Rule of Civil

Procedure 12(b)(6) (see Docket Entries 28, 30). Following the

denial of those dismissal motions (see Docket Entry 36 (adopting

Docket Entry 34)), the Court (per the undersigned Magistrate Judge)

promptly "adopt[ed a] Scheduling Order" (Text Order dated May 23,

2023), authorizing six months of discovery (see id. (setting

discovery deadline of November 27, 2023)). After discovery closed,

3

Defendants timely filed the instant Motion (Docket Entry 43) and supporting brief (Docket Entry 44), along with affidavits from Defendants (Docket Entries 44-2, 44-3) and medical records regarding Plaintiff (Docket Entries 44-4, 44-5, 44-6).[3]

The Clerk then sent Plaintiff a letter (dated December 28, 2023) advising her of her "right to file a 20-page response in opposition to the [instant M]otion[]" (Docket Entry 45 at 1 (parentheses omitted)), as well as "affidavits setting out [her] version of any relevant disputed material facts or . . . other responsive material" (id.; see also id. ("A response to a motion for summary judgment must be filed within 30 days from the date of service on you.")). That letter explicitly warned Plaintiff that her "failure to respond or, if appropriate, to file affidavits or evidence in rebuttal within the allowed time may cause the [C]ourt to conclude that [ D]efendants' contentions are undisputed and/or that [she] no longer wish[es] to pursue the matter." (Id. (parentheses omitted).) Despite that warning, Plaintiff did not respond. (See Docket Entries dated Dec. 27, 2023, to present.)

_____

3 The first two of the above-referenced sub-sets of medical records duplicate each other (with each sub-set bearing Bates stamps of WP 00141 through WP280). (Compare Docket Entry 44-4, with Docket Entry 44-5.) Defendants later corrected that oversight by filing the medical records bearing Bates stamps of WP 00001 though 00140. (See Docket Entries 46, 46-1, 46-2, 46-3.) Because the record does not establish that Defendants ever served that late-filed material on Plaintiff (such that she could have raised any objection to its consideration), the undersigned Magistrate Judge has not considered it for present purposes.

4

<u>DISCUSSION</u>

"The [C]ourt shall grant summary judgment if [Defendants] show[] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for [Plaintiff]." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). When considering summary judgment, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to [Plaintiff]." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Put another way, Plaintiff "is entitled to have the credibility of h[er] evidence as forecast assumed, h[er] version of all that is in dispute accepted, and all internal conflicts in it resolved favorably to h[er]." <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (internal brackets and quotation marks omitted). If, applying that standard, the Court "find[s] that a reasonable jury could return a verdict for [Plaintiff], then a genuine factual dispute exists and summary judgment is improper." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996); <u>see also</u> <u>Anderson</u>, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of

5

the suit under the governing law will properly preclude the entry of summary judgment.").[4]

As detailed in the Introduction, Plaintiff has asserted a claim for violation of her "8th Amendment [right against c]ruel and unusual [p]unishment" (Docket Entry 20-1 at 3), arising from alleged inadequate medical care she received while confined at a county jail (see id. at 4-5). That claim – commonly called "deliberate indifference to serious medical needs," Farmer v. Brennan, 511 U.S. 825, 835 (1994) (internal quotation marks omitted) – derives from this constitutional principle: "[W]hen the State takes a person into its custody and holds h[er] there against h[er] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for h[er] safety and general well-being." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989). In other words, "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders h[er] unable to care for h[er]self, and at the same time fails to provide for h[er] . . . medical care . . .[,] it transgresses the substantive limits on state action set by the Eighth Amendment [for convicted prisoners] and the Due Process Clause [of the Fifth and Fourteenth Amendments for pretrial

_____

4 "[T]he [ C]ourt must review the [instant M]otion, even if unopposed, and determine from what [the Court] has before it whether [Defendants are] entitled to summary judgment as a matter of law." Robinson v. Wix Filtration Corp., 599 F.3d 403, 409 n.8 (4th Cir. 2010) (emphasis and internal quotation marks omitted).

detainees].” Id. at 200; see also Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021) (reiterating that, when a plaintiff complains about provision of medical care during state confinement as "a pretrial detainee and not a convicted prisoner, the Fourteenth Amendment, and not the Eighth Amendment, governs his claim" (internal quotation marks omitted)); Loe v. Armistead, 582 F.2d 1291, 1293-94 (4th Cir. 1978) ("[The plaintiff] was not a prisoner detained under a judgment of conviction; rather, he was a pretrial detainee. Under such circumstances, the protections that apply to him are found in the due process clause of the fifth amendment, since he was a federal prisoner, rather than in the eighth amendment's prohibition against cruel and unusual punishment.").

The Second Amended Complaint, which Plaintiff dated as signed on December 18, 2022 (see Docket Entry 20-1 at 11), identifies her as a "[c]onvicted and sentenced federal prisoner" (id. at 4; see also id. at 2 (listing federal prison for Plaintiff's address)), just as does her original Complaint (see Docket Entry 2 at 4; see also id. at 2 (listing federal prison for Plaintiff's address)), which she dated as signed on December 8, 2021 (see id. at 11). Consistent with those representations about Plaintiff's status at the time she filed this action and the operative pleading, the records of this Court and of a neighboring federal court reflect:

1) on October 15, 2014, this Court (per Senior United States District Judge N. Carlton Tilley, Jr.) entered a judgment against

7

Plaintiff, memorializing the sentence of 66 months in prison followed by three years of supervised release imposed upon her as a result of her conviction for bank robbery, see Judgment, United States v. Vaughn, No. 1:14CR88, Docket Entry 16, at 1-3 (M.D.N.C. Oct. 15, 2014);

2) after completing that prison term, Plaintiff "was arrested on" September 27, 2019, on a warrant issued for "[v]iolations of [c]onditions of [s]upervised [r]elease," Executed Arrest Warrant, United States v. Vaughn, No. 1:14CR88, Docket Entry 32, at 1 (M.D.N.C. Oct. 1, 2019); see also United States v. Vaughn, No. 1:14CR88, Docket Entry 31, at 1 (M.D.N.C. Sept. 27, 2019) (slip op.) ("Pending [a detention] hearing, [Plaintiff] is to be detained in the custody of the United States marshal . . . .");

3) a week later, the Court (per United States Magistrate Judge Joe L. Webster) ordered Plaintiff "held in custody until the final revocation hearing," United States v. Vaughn, No. 1:14CR88, Docket Entry 36, at 4 (M.D.N.C. Oct. 4, 2019) (slip op.);

4) on October 17, 2019, Plaintiff "was found to have violated the terms and conditions of h[er] supervised release," Judgment, United States v. Vaughn, No. 1:14CR88, Docket Entry 40, at 1 (M.D.N.C. Nov. 27, 2019), resulting in her "commit[ment] to the custody of the Bureau of Prisons [('BOP')] for imprisonment for a period of 18 months," id. at 2;

8

5) "[o]n October 7, 2020, the BOP transferred [Plaintiff] to the South Raleigh Re-Entry Center in Raleigh, North Carolina," Criminal Compl., <u>United States v. Vaughn</u>, No. 5:21CR211, Docket Entry 1, at 3 (E.D.N.C. Mar. 5, 2021), with a "projected release date from custody of February 15, 2021," <u>id.</u>;

6) on December 24, 2020, Plaintiff "le[ft] th[at] facility and [did] not return[]," <u>id.</u>, leading the BOP to report "that [she] had escaped," <u>id.</u>;

7) on March 5, 2021, the United States District Court for the Eastern District of North Carolina issued a warrant for Plaintiff's arrest for escape, pursuant to which she "was arrested on" March 23, 2021, Executed Arrest Warrant, <u>United States v. Vaughn</u>, No. 5:21CR211, Docket Entry 11, at 1 (E.D.N.C. Mar. 5, 2021), and thereafter detained, <u>see</u> <u>United States v. Vaughn</u>, No. 5:21CR211, Docket Entry 6 (E.D.N.C. Mar. 29, 2021) (slip op.); <u>United States v. Vaughn</u>, No. 5:21CR211 (E.D.N.C. Mar. 31, 2021) (Text Order); <u>United States v. Vaughn</u>, No. 5:21CR211, Docket Entry 13 (E.D.N.C. Apr. 9, 2021) (slip op.);

8) on August 4, 2021, that court entered a judgment against Plaintiff, memorializing the sentence of 21 months in prison followed by three years of supervised release imposed upon her as a result of her conviction for escape, <u>see</u> Judgment, <u>United States v. Vaughn</u>, No. 5:21CR211, Docket Entry 32, at 1-3 (E.D.N.C. Aug. 4, 2021); and

9) "[o]n January 27, 2023, [Plaintiff] was released from the [BOP]," United States v. Vaughn, No. 5:21CR211, Docket Entry 38, at 1 (E.D.N.C. Nov. 27, 2023) (slip op.).

A question nonetheless remains about the nature of Plaintiff's custodial status at the time of the events at issue in the Second Amended Complaint, which allegedly "happened in [the] Greensboro [j]ail [in] . . . Oct[ober 20]19" (Docket Entry 20-1 at 4 (emphasis added)). In that regard (as detailed above), (A) Plaintiff spent the period between September 27 and October 17, 2019, in federal custody pending adjudication of a supervised release violation petition, (B) from October 17, 2019, to December 24, 2020, she served a federal revocation sentence, and (C) she returned to federal custody on March 23, 2021 (then with still more than a month to serve on her revocation sentence and subject to pretrial detention on a new charge), where she remained until January 27, 2023 (under a new prison sentence as of August 4, 2021).

As concerns the first of those three blocks of time, a judge of this Court (sitting by designation in a neighboring court) has described a person "awaiting a final supervised revocation hearing," Dekattu v. Burnette, No. 3:22CV265, 2022 WL 17085950, at *1 (W.D.N.C. Nov. 18, 2022) (unpublished) (Schroeder, J.), as "a pretrial detainee," id. That description makes sense "as a practical matter[ because a person] detained while awaiting a resolution of a petition to revoke supervised release . . . [i]s

10

not automatically guilty of the supervised release violation and is thus properly treated as a pretrial detainee." Sullivan v. Multnomah Cnty., No. 3:19CV995, 2021 WL 4248082, at *2 (D. Or. Sept. 17, 2021) (unpublished); but see Hinkson v. Rahbany, No. 4:18CV749, 2022 WL 741757, at *5 n.7 (E.D. Ark. Jan. 25, 2022) (unpublished) ("[The plaintiff] was not a pretrial detainee, but was a convicted prisoner since he was arrested for violating the conditions of his supervised release, which had been imposed with a [prior] conviction . . . ."). Accordingly, for part of the time-frame highlighted in the Second Amended Complaint, i.e., October 1-17, 2019, Plaintiff qualified as a federal pretrial detainee, but for the rest of that time-frame, i.e., October 17-31, 2019, she qualified as an adjudicated and sentenced federal prisoner. The standards set by the Fifth Amendment's Due Process Clause protected Plaintiff during the former segment and the standards set by the Eighth Amendment's Cruel and Unusual Punishment Clause protected her during the latter segment. See, e.g., United States v. Wedington, No. 19-597, 2020 WL 4569524, at *5 n.2 (D. Md. Aug. 7, 2020) (unpublished) ("Eighth Amendment protections apply to individuals who have been convicted and sentenced. For federal pretrial detainees . . ., the due process protections of the Fifth Amendment apply." (internal citation omitted)).

Until recently, that distinction would have lacked functional significance, because, after "the Supreme Court finally adopted a

11

[subjective] test for Eighth Amendment deliberate indifference claims in *Farmer*," Short v. Hartman, 87 F.4th 593, 606-07 (4th Cir. 2023); see also id. at 607 ("That test is subjective[.]"), the United States Court of Appeals for the Fourth Circuit determined "that the same 'deliberate indifference' standard applies to both [sentenced] inmates and pretrial detainees," Brown v. Harris, 240 F.3d 383, 388 n.6 (4th Cir. 2001). But the Fourth Circuit now has rejected that approach, see Short, 87 F.4th at 609-11, and has formulated this four-element test for a pretrial detainee's "claim for deliberate indifference to a medical need," id. at 611:

> (1) the[ plaintiff] had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the [plaintiff] had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the [plaintiff] was harmed.

Id.[5]

The Short Court thereafter explained:

> The objective test we adopt today differs from our prior subjective test in one respect only. The plaintiff no longer has to show that the defendant had actual knowledge of the [plaintiff's] serious medical condition

---

5 Short involved a pretrial detainee in state (rather than federal) custody, see Short, 87 F.4th at 6, but "[s]urely the Fourteenth Amendment imposes no more stringent requirements upon state officials than does the Fifth [Amendment] upon their federal counterparts," Paul v. Davis, 424 U.S. 693, 702 n.3 (1976). "[The Court] thus [should] consider [judicial] decisions interpreting either [Due Process] Clause as relevant to [the] examination of [Plaintiff's] claim." Id.

12

and consciously disregarded the risk that [the
defendant's] action or failure to act would result in
harm. . . . Now, it is sufficient that the plaintiff
show that the defendant's action or inaction was . . .
objectively unreasonable: that is, the plaintiff must
show that the defendant should have known of that
condition and that risk, and acted accordingly. . . .

To be clear, it is still not enough for the plaintiff to
allege that the defendant negligently or accidentally
failed to do right by the detainee. Negligence was not
enough before and it is not enough now.

Id. at 611-12 (internal citations and quotation marks omitted).[6]

Hence, two different legal tests would apply to Defendants'
alleged conduct depending on when, within October 2019, that
conduct occurred. However, a further analytical complication
arises in this case because Plaintiff's medical records (the
admissibility of which she has not contested[7]) conclusively refute
the allegations in the Second Amended Complaint that these material
"event[s ] happened in . . . Oct[ober 20]19" (Docket Entry 20-1 at

_____

6 The line Short envisions between its new standard for
deliberate indifference to a pretrial detainee's serious medical
needs and negligence may prove difficult to draw in many cases.
See Patterson v. Stanly Cnty. Det. Ctr., No. 1:22CV515, 2024 WL
1936499, at *4 n.2 (M.D.N.C. May 2, 2024) (unpublished),
recommendation adopted, slip op. (M.D.N.C. June 12, 2024).

7 "[B]ecause [Plaintiff] ha[s] not objected that the materials
submitted cannot be presented in a form that would be admissible in
evidence, and because the [undersigned Magistrate Judge] perceives
no reason why such medical records could not be authenticated if
[Defendants] w[ere] called upon to do so, the Court could consider
their conten[t]s undisputed for purposes of the [instant M]otion."
Jones v. Western Tidewater Reg'l Jail, 187 F. Supp. 3d 648, 654
(E.D. Va. 2016) (internal brackets and quotation marks omitted),
reconsideration denied and judgment ordered, No. 2:15CV316, 2016 WL
3647591 (E.D. Va. June 30, 2016) (unpublished), aff'd sub nom.,
Jones v. Butler, 671 F. App'x 60 (4th Cir. 2016).

4 (emphasis added); see also id. at 5 ("I was in [j]ail in Oct[ober 20]19 and this is when it all happen[ed]."")): (A) "[Plaintiff] came to [the] Greensboro [j]ail with 4 stitches in [her] finger due to a fight" (id. at 5), (B) her "hand [sta]rted tak[ing] a turn for the worse" (id.), and (C) "[i]nfection started setting in" (id.); in particular, Plaintiff's medical records show that:

1) Plaintiff actually entered the Greensboro jail on August 23, 2019, after her discharge from an overnight hospital stay for treatment of a pre-existing infection in a fight-injured finger (see, e.g., Docket Entry 44-5 at 27 (stating, in summary of Plaintiff's treatment from August 22-23, 2019, for "[a]bscess of finger of right hand," that "[she] will be discharged to jail"), 139 (documenting, in note from physician assistant at hospital, that Plaintiff's physical examination on August 22, 2019, revealed "obvious swelling around the right ring finger," which extend[ed] into the hand," as well as "a break in the skin . . . with purulent drainage"); Docket Entry 44-6 at 3 (provider note from physician assistant at hospital made on August 22, 2023: "[Plaintiff] presents today for evaluation of a right finger infection. . . . Reports that this was from a bite wound after punching someone in the face . . . . [Plaintiff] is in police custody while here."); see also Docket Entry 44-5 at 71 (referring to "fight bite [as] occurr[ing] on 8/18/2019"));

14

2) during that hospital stay, Plaintiff underwent "irrigation and debridement [('I&D') of her] right ring finger[ by a s]urgeon" (Docket Entry 44-5 at 35 (all-caps font omitted); accord id. at 72, 86, 95, 112, 116), and received "[t]reat[ment] with clindamycin" (id. at 86; accord id. at 103);

3) on August 23, 2019, Plaintiff "[was] discharged . . . with oral clindamycin" (id. at 86; accord id. at 95, 103, 122)[8] and instructions for "[w]ound care" (id. at 27), providing for "daily dressing changes" after "[w]ash[ing] finger with soap and water, dry[ing it] well[, and] apply[ing] bacitracin" (id.);

4) upon Plaintiff's return to the Greensboro jail, she received (A) clindamycin three times a day from August 24-29, 2019

_____

8 The "Medication Overview" in the "Hospital Summary" from Plaintiff's hospital stay on August 22-23, 2019, directs that she should "start taking" only "acetaminophen" and "clindamycin" (Docket Entry 44-5 at 27 (all-caps font omitted)), without any mention of another antibiotic commonly called Bactrim (see id.); however, the "Medication Overview" in the "Hospital Summary" from Plaintiff's hospital stay on August 30-September 3, 2019, directs her to "stop taking[] sulfamenthoxazole-trimethoprim 800-160 MG tablet (Bactrim DS, Septra DS)" (id. at 18 (all-caps font omitted)), as do notations within the discharge summary from September 3, 2019 (see id. at 90, 99; see also id. at 71 (indicating, in progress note made by physician assistant at hospital on September 18, 2019, that, after Plaintiff's hospital stay on August 22-23, 2019, "[s]he was discharged with antibiotics including clindamycin and Bactrim"), 116 (same, in progress note made by doctor on August 30, 2019).) Jail medical records similarly reflect some confusion on this front, as they document orders by Defendant Norwood for clindamycin and acetaminophen for Plaintiff on August 23, 2019 (see Docket Entry 44-6 at 51; accord Docket Entry 44-5 at 7), with his order for Bactrim for her not entered until August 30, 2019 (see Docket Entry 44-6 at 49; accord Docket Entry 44-5 at 8), at which point he already had returned her to the hospital (see, e.g., Docket Entry 44-6 at 10).

15

(see id. at 7; see also id. at 10 (indicating that Plaintiff "[r]efused" attempted "[a]dministration" of "clindamycin" once on "08/23/2019"); Docket Entry 44-6 at 51 (documenting Defendant Norwood's order on August 23, 2019, for Plaintiff to receive clindamycin three times a day)), as well as (B) daily "Wound Care," consisting of "[w]ash[ing] finger with soap and water, dry[ing] well[, and a]pply[ing] bacitracin [before] apply[ing] dry dressing" (Docket Entry 44-5 at 7), on at least August 23, 25, 26, 28, and 29, 2019 (see id.; see also id. at 10 (listing "Status" of "Hold One Medpa [sic]" for "Wound Care" on "08/24/2019" and "08/27/2019" in "Notes" corresponding to asterisks in entries for those dates in chart of "Wound Care" (id. at 7)); Docket Entry 44-6 at 50 (documenting Defendant Norwood's order on August 23, 2019, for Plaintiff to receive daily wound care));

5) during Plaintiff's wound care on August 30, 2019, Defendant Norwood observed that (A) Plaintiff "did not tolerate [the dressing change] well due to pain" (Docket Entry 44-6 at 24; accord id. at 121), as "she report[ed] 10/10 right 4th finger pain that [wa]s continual, characterized as being achy and throbbing" (id. at 121; see also id. ("Associated symptoms include: drainage and decreased range of motion.")), and (B) her finger appeared "moderately swollen" with the "[l]ateral incision site [] producing purulent drainage" (id.; see also id. ("[The] sutures are not intact. The finger has poor range of motion and [is] tender to the touch."));

16

6) that same day, (A) Defendant Norwood "[r]ecommend[ed a] hospital evaluation due to length of time from original injury, treatment, and current status" (id.; accord id. at 24), and (B) "[Plaintiff] arrived [at the hospital] handcuffed in police custody with 2 Sheriffs" (Docket Entry 44-5 at 121);

7) the emergency department doctor who evaluated Plaintiff at that time noted that, since her discharge from the hospital on August 23, 2019, "[she] ha[d] been in prison [sic] recovering, but her pain ha[d] been getting worse[ and was] now severe, spreading to the hand and forearm, [with] continued purulent drainage from the wound" (id. at 116), despite the fact that she "[e]ndors[ed] full compliance with her antibiotics" (id.);

8) after "discuss[ion] with [the surgeon who performed the I&D on Plaintiff's finger on August 22, 2019], [she] was given IV vancomycin and clindamycin . . . [and] admitted to hospital service for further care and evaluation" (id. at 120; accord id. at 104), with a diagnosis of "[w]ound infection" (id. at 120);

9) on August 31, 2019, the hand surgeon who performed the prior I&D on Plaintiff's finger, (A) "assess[ed] her with an i]nfection [of the] RRF – recurrent" (id. at 115; accord id. at 122), and (B) performed another "[i]ncision and drainage of [her] right ring finger" (id. at 122; accord id. at 72, 86; see also id. at 122 ("[Plaintiff] returned back to the [hospital] with worsening signs of infection, so she is here for repeat I and D. . . . The

17

old incision was opened.  The old sutures were removed.  There was some purulence to the finger.  This was thoroughly irrigated again. The extensor tendon sheath was opened and irrigated as well as the PIP joint.  All tissues appeared clean and viable at the conclusion of the procedure. . . .  The wound was then loosely approximated with one stitch . . . and a sterile dressing was applied."));

10) Plaintiff remained in the hospital, based on her surgeon's "recommendation . . . for at least 2 to 3 days of IV antibiotics, given this [wa]s a second episode of infection" (id. at 87), until her "discharge[ on September 3, 2019,] on clindamycin" (id.; see also id. at 85 (listing Plaintiff's "Discharge Date[ as] 9/3/2019" (bold font omitted)), 99 (including, in discharge summary prepared on September 3, 2019, directive for Plaintiff to take "clindamycin 300 MG capsule . . . by mouth 3 (three) times daily for 10 days" (bold font omitted))), along with "[d]ischarge wound care" instructions "to wash [finger] with soap and water and cover [with] dry gauze daily" and "gently squeeze wound to promote any drainage" (id. at 90; accord id. at 24, 91, 100);[9]

---

9 Notwithstanding Plaintiff's earlier "[e]ndors[ement to hospital staff of] full compliance with her antibiotics" (Docket Entry 44-5 at 116), the above-quoted "Discharge Summary" states that "apparently [she] did not receive any antibiotic when she was in prison [sic]" (id. at 87), without identifying the basis for that statement (see id.; see also id. at 38 (observing, in surgeon's "Operative Report" for amputation of Plaintiff's finger on October 1, 2019, that, during week between her two I&D procedures, "[she] was incarcerated . . . and questionable taking her antibiotics or receiving correction or performing her dressing changes as instructed" (all-caps font omitted))).

Case 1:21-cv-00960-LCB-LPA   Document 47   Filed 06/18/24   Page 18 of 37

11) upon Plaintiff's return to the Greensboro jail on September 3, 2019, Defendant Haq promptly reinstated the order for Plaintiff to receive daily wound care and three doses of clindamycin each day (see Docket Entry 44-6 at 46-47), but she declined to cooperate with wound care and/or to take her prescribed antibiotic on multiple occasions during the period of September 3-17, 2019 (see id. at 90, 95, 101, 106, 146-48), even after counseling by medical staff about "the importance of having wound care completed, . . . [due to the risk] of [her] finger becoming further infected" (id. at 95);[10]

12) on September 13, 2019, Defendant Norwood "viewed and dressed [Plaintiff's] wound" (id. at 89) and noted that it "appear[ed] to have reduced well, but continue[d] to be extremely sensitive to touch" (id. at 116), with "[Plaintiff] continu[ing] to report[] pain that is constant, throbbing and radiating into the arm" (id.; see also id. ("[Plaintiff] states it hurts so bad she

_____

10 Plaintiff's medical records include a progress note entered by Defendant Norwood on September 6, 2019, which references a "follow-up per protocol after being sent to the emergency department on 9/4/19 due to a severe right 4th finger infection." (Docket Entry 44-6 at 119 (emphasis added).) The underscored language actually appears to refer to Plaintiff's trip to the emergency department on August 30, 2019. (See Docket Entry 44-3 at 4 (setting out Defendant Norwood's sworn account of (A) Plaintiff's transport, "[o]n August 30, 2019, . . . to the hospital, per [his] instruction," (B) her subsequent "admi[ssion] to the hospital for evaluation and treatment . . . [until her] discharge[] on September 3, 2019 to return to [the Greensboro jail]," and (C) his encounter with her "[o]n September 6, 2019, . . . for one week follow-up per protocol after [her] return from the hospital," with no mention of any additional hospital visit on September 4, 2019).)

19

wants to have it cut off. She says she has told multiple people that she was going to kill herself due to the pain . . . .")) ;

13) as a result, Defendant Norwood referred Plaintiff for "follow-up with [her] hand specialist/surgeon as soon as possible" (id.; see also id. (placing Plaintiff on "[s]uicide watch due to multiple mentions of killing herself because of the pain she feels" (underscoring omitted))), leading to the scheduling of an appointment for September 23, 2019 (see id. at 114);

14) in the interim, however, on September 17, 2019, Plaintiff reported to jail medical staff that she was "[e]xperiencing severe pain to [her right] hand from [the] 4th digit [which] radiate[d] up to [her] elbow" (id. at 89; see also id. (highlighting "red viscera pushing out through opening next to two sutures" and describing difficulty of dressing change due to Plaintiff's pain));

15) Defendant Norwood saw Plaintiff the next morning, "noted that wound dehensience [sic] ha[d] occurred" (id. at 114; see also id. ("The digit is moderately swollen with beefy red tissue measuring 0.5-1 cm in diameter protruding from the lateral aspect.")), assessed her as experiencing "[w]orsening wound status" (id.), and "decided to send her to the emergency department for further treatment" (id.);

16) upon arrival at the hospital on the morning of September 18, 2019, Plaintiff "state[d] she finished her antibiotics though pain ha[d] progressively worsened and been persistent since [her]

discharge [on September 3, 2019]" (Docket Entry 44-5 at 71; <u>see also</u> <u>id.</u> ("[Plaintiff s]tates she has additional swelling of tissue out of the wound that began a few days ago."));

17) during that hospital visit, the surgeon who previously performed the two I&Ds on Plaintiff's finger "reviewed images of [her] finger in [her] chart" (<u>id.</u> at 78; <u>see also</u> <u>id.</u> at 79 (noting that surgeon "suggest[ed]" images revealed "signs of possible osteomyelitis" rather than "osteopenia")), "state[d that her] finger look[ed] improved" (<u>id.</u> at 79), "recommend[ed that] she d[id] not need admission at th[at] time" (<u>id.</u>), and "[r]ecommend[ed that she] start doxycycline twice daily x30 days, [maintain] good wound care, and follow-up with him [the] next week" (<u>id.</u>);

18) Plaintiff was then "discharged back to prison [sic] with instructions for follow-up and prescriptions" (<u>id.</u>; <u>see also</u> <u>id.</u> at 13 (summarizing, from Plaintiff's hospital visit on September 18, 2019, her medication changes, wound care instructions, and direction to "[s]chedule an appointment with [surgeon]"), 70 (documenting Plaintiff's discharge on September 18, 2019, and "transfer[ t]o [c]ourt/law [e]nforcement"));

19) upon Plaintiff's return to the Greensboro jail on September 18, 2019, Defendant Norwood updated her antibiotic prescription consistent with her discharge instructions (<u>see</u> Docket Entry 44-6 at 37; <u>accord</u> Docket Entry 44-5 at 1; <u>see also</u> Docket Entry 44-6 at 20 (reiterating continued need for "[w]ound [c]are

21

[d]aily until healed or otherwise instructed by surgical group" on September 20, 2019 (bold font and underscoring omitted)));

20) on September 20, 2019, Defendant Norwood saw Plaintiff "on follow-up per protocol after [she was] seen at [the hospital] emergency department on 9/18/19 for worsening symptoms in [her] right ring finger" (Docket Entry 44-6 at 111);

21) during that encounter, "[Plaintiff] report[ed] being diagnosed with 'myelitis[, i.e., a]n infection of the bone'" (id.), but stated "that since starting her new antibiotic she feels much better and is experiencing much less pain" (id.; but see Docket Entry 44-5 at 4 (documenting Plaintiff's refusal of new antibiotic once on September 19, 2019));

22) upon examination, Defendant Norwood "noted [Plaintiff's] finger] to display decreased swelling," albeit still with "a portion of tissue protruding that is beefy red measuring 1cm long" (Docket Entry 44-6 at 111; see also id. ("Scant amount of serosanguineous drainage noted on bandaging."));

23) over the next week, Plaintiff refused to take her new antibiotic and/or to cooperate with wound care multiple times (see Docket Entry 44-5 at 4; Docket Entry 44-6 at 79, 81, 144-45);

24) on September 25, 2019, Plaintiff communicated to jail medical staff that Plaintiff intended to have her surgeon "'cut [Plaintiff's] finger off when [she went] back to [her] appointment'" (Docket Entry 44-6 at 81); and

25) the amputation of Plaintiff's finger took place on October 1, 2019 (see Docket Entry 44-5 at 38-39; Docket Entry 44-6 at 77; see also Docket Entry 44-5 at 37 (stating, in surgeon's note dated October 1, 2019, that "[Plaintiff] desires amputation of finger – I agree with this plan"); Docket Entry 44-6 at 33 ("Medication Order," entered by Defendant Haq on October 1, 2019, discontinuing "[w]ound [c]are" order from September 3, 2019, and antibiotic order from September 18, 2019 (bold font omitted)), 134 (request form submitted by Plaintiff at Greensboro jail on October 1, 2019: "I'm [r]equesting to go on Regular Population [n]ow that my hand is better. I'm doing really great.")).

In sum, the material events that culminated with the amputation of Plaintiff's finger on October 1, 2019, all transpired between August 18, 2019 (i.e., the date of the injury to Plaintiff's finger), and September 25, 2019 (i.e., the date by which Plaintiff had decided to have her finger amputated). And, according to records from her federal criminal case in this Court, Plaintiff's custody at the Greensboro jail within that time-span (i.e., beginning August 23, 2019, and continuing through September 25, 2019), stemmed from her then-pending, state charges. See Amend. to Pet., United States v. Vaughn, No. 1:14CR88, Docket Entry 33, at 2 (M.D.N.C. Oct. 3, 2019) ("On September 26, 2019, [Plaintiff] pled guilty to Misdemeanor (M) Resisting Public Officer (Guilford County 19CR82204) and was sentenced to 35 days in jail.

23

The offense date was August 22, 2019.  An accompanying charge of (M) Possess Drug Paraphernalia . . . was voluntarily dismissed."); see also id. at 1 ("On August 22, 2019, when [Plaintiff] was arrested for the [Resisting Public Officer and Possess Drug Paraphernalia] violations . . ., an outstanding Order for Arrest (OFA) related to [her] missing a scheduled state court appearance regarding [a prior citation for Possession of Drug Paraphernalia] was served."), 2 ("Due to an injury to her right ring finger, the jail refused to accept [Plaintiff on August 22, 2019,] and she was transported to [the] hospital for follow-up treatment.  She was then transferred back to the jail on or about August 23, 2019.").[11]

Because the medical care about which Plaintiff has complained occurred during her confinement on state charges as "a pretrial detainee and not a convicted prisoner, the Fourteenth Amendment, and not the Eighth Amendment, governs h[er] claim." Mays, 992 F.3d at 300 (internal quotation marks omitted).[12]  And (as detailed

_____

11 Plaintiff's medical records reflect roughly the same end-date for her time in state custody.  (See Docket Entry 44-6 at 135 (request form submitted on October 1, 2019, in which Plaintiff sought removal of medical-related charge from her jail account because she was "on a [f]ederal [p]robation violation" and thus "a federal [i]nmate," to which, the next day, medical staff responded: "As of 9/24/19 you became a federal inmate[, but] your charges are before then."), 137 (request form submitted on September 25, 2019, in which Plaintiff sought removal of medical-related charge from her jail account because she was "a federal [i]nmate," to which, the next day, medical staff responded:  "You have federal charges although you are not a federal inmate at this time.").)

12 A determination that the alleged deprivation of medical care happened during Plaintiff's federal pretrial detention would
(continued...)

earlier) such Fourteenth Amendment claims now require Plaintiff to prove these four elements:

> (1) [Plaintiff] had a medical condition or injury that posed a substantial risk of serious harm; (2) [D]efendant[s] intentionally, knowingly, or recklessly acted or failed to act to appropriately

---

12(...continued)
have raised issues about the viability of Section 1983 as a vehicle for her constitutional claim and/or of a direct constitutional claim under the rationale in <u>Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics</u>, 403 U.S. 388 (1971), particularly given Defendants' apparent status as private contractors (<u>see</u> Docket Entry 44-2 at 1 (indicating that Defendant Haq's work at Greensboro jail represented only "part of [his] active clinical practice"), 5 (describing Defendants as "Wellpath[] healthcare providers"), 6 (same); Docket Entry 44-3 at 1 ("[Defendant Norwood] worked as a Nurse Practitioner for an entity which was contracted to provide medical care to inmates at [the Greensboro jail]."), 7 (describing Defendants as "Wellpath[] healthcare providers"). <u>Compare, e.g.</u>, <u>Scott v. Keith</u>, No. CV20-14, 2021 WL 4876211, at *3 (D. Mont. Sept. 13, 2021) (unpublished) ("[A]s [the plaintiff] was a federal detainee, the jail was functioning in a federal capacity as to him, and he cannot state a § 1983 claim against a private entity in this context. Because [the plaintiff] was in federal custody at all times giving rise to his allegations, his medical claims would potentially arise under <i>Bivens</i>, the federal analogue to § 1983. However, . . . the Supreme Court [has] declined to create an implied damages remedy in an Eighth Amendment suit against a private prison. Therefore, it is unclear at this point whether a suit regarding medical care would be viable against [a private healthcare provider] in [the plaintiff's] circumstances . . . ." (internal citations, quotation marks, and full case-name omitted) (referring to <u>Correctional Servs. Corp. v. Malesko</u>, 534 U.S. 61 (2001))), <u>recommendation adopted</u>, 2021 WL 4860947 (D. Mont. Oct. 19, 2021) (unpublished), <u>with, e.g.</u>, <u>Jones v. Green</u>, Civ. No. 03-3335, 2006 WL 3677934, at *2 (D.N.J. Dec. 11, 2006) (unpublished) ("The constitutional violations at issue in this case allegedly occurred while [the p]laintiff was housed at a state correctional facility . . . . Although [the p]laintiff is a federal prisoner, his claims arise out of alleged conduct by [a state] official . . . and [state] employee . . . . Because these individuals would be acting under color of state law, [Section] 1983 provides [the p]laintiff with sources of his cause of action to redress alleged violation of his rights under . . . the Constitution.").

address the risk that the condition posed; (3) [they] knew or should have known (a) that [she] had that condition and (b) that [their] action or inaction posed an unjustifiably high risk of harm; and (4) as a result, [she] was harmed.

Short, 87 F.4th at 611.

In seeking summary judgment, Defendants did not raise any dispute as to Short's element (1) and sub-element (3)(a), i.e., that Plaintiff suffered from a finger infection "that posed a substantial risk of serious harm," id., and that they "knew or should have known [] that [she] had that condition," id. (See Docket Entry 44 at 9 ("[I]t is undisputed that Defendants provided medical care in response to Plaintiff's serious medical needs on over forty occasions during the relevant timeframe . . . ."); see also id. at 9-10 (admitting that Defendants reviewed hospital records setting forth treatment Plaintiff needed).) Defendants, however, have contested the sufficiency of the evidence as to Short's element (2), sub-element (3)(b), and element (4), i.e., that they "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that [Plaintiff's] condition posed," Short, 87 F.4th at 611, that they "knew or should have known . . . that [their] action or inaction posed an unjustifiably high risk of harm," id., and that, "as a result, [she] was harmed," id. (See Docket Entry 44 at 10-12 ("Plaintiff's own medical records[] and . . . the affidavits of [Defendant] Norwood and [Defendant] Haq[] unquestionably establish[] that

26

[they] were compliant with the orders of [her] hand surgeon and hospital discharge instructions, did not make any changes to those orders unless specifically ordered by [her] hand surgeon or hospital discharge instructions to do so, and . . . did not ignore [her] medical needs. . . . Plaintiff failed to prove that [Defendants'] alleged actions and/or inactions caused her finger to be amputated. . . . [She] has put forth no evidence, including any expert witness, to causally link [their] actions or inactions to the amputation of her right ring finger.").)

To support their position on those points, Defendants (as noted in the foregoing quotation from their summary judgment brief) relied not only on Plaintiff's previously cataloged medical records but also their affidavits (sworn before a notary (see Docket Entry 44-2 at 7; Docket Entry 44-3 at 9)), which contain, inter alia, these pertinent averments:

1) Defendant Haq, who "ha[s] been a duly licensed medical doctor" and "a board-certified family doctor since 1997" (Docket Entry 44-2 at 1), and, "from March of 2018 through June of 2023, [] provided active, hands-on, clinical medical treatment to Guilford County jail inmates" (id.), "ha[s] knowledge of the applicable standards of care provided by [him]self and the other healthcare providers to inmates in the [Greensboro jail]" (id.);

27

2) Defendant Norwood "ha[s] been a licensed Registered Nurse since 2004 and a licensed Nurse Practitioner since 2013" (Docket Entry 44-3 at 1);

3) "[Defendant Haq] treated Plaintiff . . . while she was incarcerated at the [Greensboro jail] and ha[s] personally reviewed her medical record attached [as Docket Entries 44-5 and 44-6]" (Docket Entry 44-2 at 1);

4) "[Defendant Norwood also] treated Plaintiff . . . while she was incarcerated at the [Greensboro jail] and ha[s also] personally reviewed her medical record . . . attached [as Docket Entries 44-5 and 44-6]" (Docket Entry 44-3 at 1-2);

5) "[o]n August 22, 2019, prior to her incarceration, Plaintiff was treated at [the hospital] for right ring finger pain and swelling" (Docket Entry 44-2 at 1; <u>accord</u> Docket Entry 44-3 at 2), with examination revealing "a sign of active infection" (Docket Entry 44-2 at 2; <u>accord</u> Docket Entry 44-3 at 2);

6) "Plaintiff was discharged from the hospital on August 23, 2019 and transported to [the Greensboro jail] with orders for Tylenol as needed for mild pain, and Clindamycin for 10 days" (Docket Entry 44-2 at 2; <u>accord</u> Docket Entry 44-3 at 2), as well as "<u>daily</u> dressing changes" (Docket Entry 44-2 at 2 (emphasis added) (internal quotation marks omitted); <u>accord</u> Docket Entry 44-3 at 2 (citing, inter alia, Docket Entry 44-5 at 27); <u>see also</u> Docket Entry 44-2 at 2 ("Plaintiff's August 23, 2019 hospital discharge

28

instructions did <u>not</u> include wound care <u>twice daily</u>." (emphasis added)); Docket Entry 44-3 at 3 ("[Defendant Norwood] reviewed Plaintiff's August 23, 2019 hospital discharge instructions and hospital records which do <u>not</u> include instructions for wound care <u>twice daily</u>." (emphasis added) (citing, inter alia, Docket Entry 44-5 at 27)));

7) "[b]ased upon Plaintiff's [medical] chart, the jail nursing staff followed the aforementioned instructions" (Docket Entry 44-2 at 2; <u>accord</u> Docket Entry 44-3 at 3 (citing, inter alia, Docket Entry 44-5 at 7 and Docket Entry 44-6 at 148); <u>see also</u> Docket Entry 44-3 at 3 ("On August 23, 2019 upon Plaintiff's arrival at the jail, [Defendant Norwood] ordered Plaintiff the regimen of Tylenol and Clindamycin as ordered by the hospital discharge instructions . . . . On August 23, 2019, [he] also ordered [her] wound care <u>daily</u> for 14 days per the hospital's discharge instructions . . . ." (emphasis added)));

8) "[o]n August 30, 2019, [Defendant Norwood] evaluated and treated Plaintiff's right ring finger" (Docket Entry 44-3 at 3), "noted that [her] right ring finger was still infected and . . . recommended hospital emergency department evaluation" (<u>id.</u> (citing Docket Entry 44-5 at 24, 120-21));

9) "[o]n August 30, 2019, Plaintiff was taken to the hospital, per [Defendant Norwood's] instruction" (<u>id.</u> at 4), "was admitted to the hospital for evaluation and treatment, including incision and

debridement, of her right ring finger and was discharged on September 3, 2019 to return to [the Greensboro jail]" (id.).

10) "Plaintiff's September 3, 2019 hospital discharge instructions included . . . 'wash[ing her finger] with soap and water and cover[ing it with] dry gauze <u>daily</u>'" (id. (emphasis added) (quoting Docket Entry 44-5 at 24)), as well as "another regimen of Clindamycin three times daily for ten days" (id. (citing, inter alia, Docket Entry 44-5 at 19); <u>see also</u> id. ("Plaintiff's September 3, 2019 hospital discharge instructions did <u>not</u> include instructions for wound care <u>twice daily</u>." (emphasis added) (citing Docket Entry 44-5 at 18-24)));

11) "[o]n September 3, 2019, [Defendant Haq] ordered Plaintiff's Clindamycin regimen . . . and wound care <u>daily</u> for 30 days per the hospital discharge instructions" (id. (emphasis added) (citing, inter alia, Docket Entry 44-6 at 46-47); <u>accord</u> Docket Entry 44-2 at 3);

12) "[o]n September 6, 2019, [Defendant Norwood] saw Plaintiff for one week follow-up per protocol" (Docket Entry 44-3 at 4), "evaluated and treated [her] right ring finger[, ] noted that the swelling and draining had reduced" (id.), and "ordered continuation of <u>daily</u> dressing changes" (id. (emphasis added));

13) "on September 13, 2019, [Defendant Norwood] saw Plaintiff again for follow-up evaluation" (id. at 4-5), "noted [her finger wound] as reduced, but still extremely sensitive" (id. at 5; <u>see</u>

30

also id. (reciting that "Plaintiff made several suicidal comments to others due to the pain and [Defendant Norwood] therefore placed her on suicide watch for her safety")), and "made a referral for [her] to be seen by her hand surgeon . . . as soon as possible" (id. (citing, inter alia, Docket Entry 44-6 at 116));

14) "[a]n appointment with the hand surgeon was scheduled for September 23, 2019, but following additional examination by [Defendant Norwood] on September 18, 2019, Plaintiff's right ring finger wound had separated so [he] sent [her] immediately to the hospital emergency department" (id. (citing Docket Entry 44-6 at 113-14); accord Docket Entry 44-2 at 4);

15) "Plaintiff was taken promptly to the hospital emergency department on September 18, 2019, per [Defendant Norwood's] referral" (Docket Entry 44-3 at 5), where her hand surgeon "reviewed the images of Plaintiff's finger and indicated that the finger looked improved and that she did not need to be admitted" (id.; accord Docket Entry 44-2 at 4);

16) Plaintiff's hand surgeon "prescribed a 30-day course of Doxycycline twice a day[ and] wound care daily" (Docket Entry 44-3 at 5 (emphasis added); accord Docket Entry 44-2 at 4; see also Docket Entry 44-3 at 5 ("Plaintiff's September 18, 2019 hospital records or discharge instructions did not include wound care twice daily." (emphasis added)); Docket Entry 44-2 at 4 (same));

31

17) "[o]n September 18, 2019, upon Plaintiff's return to the jail from the hospital, [Defendant Norwood] ordered Plaintiff's regimen of Doxycycline for 30 days and daily wound care per the hospital discharge instructions" (Docket Entry 44-3 at 5 (citing Docket Entry 44-5 at 1 and Docket Entry 44-6 at 37); accord Docket Entry 44-2 at 4);

18) "[o]n September 20, 2019, [Defendant Norwood] saw Plaintiff per continuation of care protocol" (Docket Entry 44-3 at 5), "[she] reported that she was feeling much better after starting her [new] antibiotic regimen" (id. at 6), and "exam reflected that [her] right ring finger had decreased swelling and there was a scant amount of drainage on the bandaging" (id.);

19) "[Defendant Norwood] continued the orders of 'wound care daily until healed or otherwise instructed by [Plaintiff's] surgical group'" (id. (emphasis added) (quoting Docket Entry 44-6 at 111 (without emphasis and capitalization from original)); see also id. ("[Defendant Norwood] also ordered Plaintiff to continue taking her antibiotic . . . ." (citing, inter alia, Docket Entry 44-6 at 112)));

20) "[a]part from the aforementioned dates when Plaintiff was in the hospital . . ., the [jail] nursing staff provided Plaintiff with daily wound care and medication administration per the respective hospital discharge instructions . . . with the exception of the instances . . . reflected in her medical records, when

Plaintiff refused to allow nursing staff to do so and/or refused to take her prescribed antibiotics" (Docket Entry 44-2 at 5 (emphasis added); accord Docket Entry 44-3 at 6 (citing, inter alia, Docket Entry 44-5 at 1, 4, 5, 7, 10 and Docket Entry 44-6 at 79, 81, 91, 95, 101, 106, 144-48)); and

21) "[o]n October 1, 2019, Plaintiff presented to the hospital per [her hand surgeon's] instructions for evaluation and amputation of her right ring finger due to continued infection" (Docket Entry 44-2 at 5; accord Docket Entry 44-3 at 7).

Additionally, Defendant Haq's affidavit offers, inter alia, these "opinions [] based on [his] education, experience, actual care and treatment of Plaintiff, and [his] review of medical records" (Docket Entry 44-2 at 7; see also id. ("I hold all of these opinions to a reasonable degree of medical certainty to a more likely than not probability.")):

1) "all of [Defendant Haq's] care and the care of all other [jail] healthcare providers, including [Defendant] Norwood, provided to Plaintiff met all applicable standards of healthcare" (id. at 6);

2) "[a]ll of the nurses and medical staff that received any report from Plaintiff during her incarceration promptly addressed those concerns within the applicable standard of care timeframe" (id.);

33

3) "all of the nurses and medical staff that received recommendations from outside providers during the [relevant] time period . . . promptly addressed [those recommendations] within the applicable standard of care timeframe" (id.);

4) "[t]he [jail] medical staff carried out [Defendant Haq's] instructions and orders as well as those of the hospital and [Plaintiff's hand surgeon] to the satisfaction of all applicable healthcare standards of care" (id.); and

5) "[n]one of [Defendant Haq's] care or the care of any other healthcare provider [at the Greensboro jail], including [Defendant] Norwood, caused or contributed to, in any way, Plaintiff's pain and suffering, infection, or removal of her right ring finger" (id. at 6-7).

The foregoing evidence – from Defendants' affidavits, as well as Plaintiff's medical records – refutes the Second Amended Complaint's material allegations, including:

1) "[Plaintiff's] hand was suppose [sic] to be washed [and the bandage] changed 2X daily and the order was changed to every 48 hours" (Docket Entry 20-1 at 4 (emphasis added); see also id. at 5 ("The [h]and [d]octor from [the] hospital sent strick [sic] orders [to] wash and change [Plaintiff's] badges [sic] twice daily . . . . [Plaintiff] was suppose[d] to . . . [have her b]andages & hand changed twice a day . . . ." (emphasis added)));

34

2) when Plaintiff "[r]eturn[ed] to [the Greensboro j]ail all orders was [sic] changed as well as medications" (id. at 5 (emphasis omitted); see also id. ("[T]hey didn't due [sic] what [the hand d]octor said due [sic], [Plaintiff's] medication was changed."));

3) jail medical staff "wasnt [sic] changing [Plaintiff's] banges [sic]" (id.; see also id. at 4 (alleging that Plaintiff did not receive wound care even every 48 hours)); and

4) "[Plaintiff] lost [her] finger due to neglect" (id. at 5; see also id. (insinuating that "[Plaintiff's] hand started tak[ing] a turn for the worse" because of alteration of her hand surgeon's orders and that "infection started setting in" because of jail medical staff's failure to "chang[e her] banges [sic]")).

Moreover, as documented in the Introduction, despite proper notice that her "failure to respond [to the instant Motion] or, if appropriate, to file affidavits or evidence in rebuttal within the allowed time may cause the [C]ourt to conclude that [ D]efendants' contentions [we]re undisputed" (Docket Entry 45 at 1 (parentheses omitted)), Plaintiff neither responded to the instant Motion nor filed any affidavits or other evidence to dispute the above-detailed evidence presented by Defendants (see Docket Entries dated Dec. 27, 2023, to present). That fact leaves the evidence submitted by Defendants uncontested, as Plaintiff did not sign the Second Amended Complaint under oath or subject to perjury penalties

35

(see Docket Entry 20-1 at 11) and, as "the opponent of a summary judgment motion . . .[, she] cannot simply rest upon h[er] unverified complaint," Higgins v. Scherr, 837 F.2d 155, 156-57 (4th Cir. 1988).[13] Simply put, Plaintiff's claims against Defendants for deliberate indifference to her serious medical needs in violation of the Fourteenth Amendment fail as a matter of law because the record evidence, viewed in the light most favorable to Plaintiff, would not permit a reasonable fact-finder to determine (A) that Defendants "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that [Plaintiff's] condition posed," Short, 87 F.4th at 611, (B) that they "knew or should have known . . . that [their] action or inaction posed an unjustifiably high risk of harm," id., and/or (C) that, "as a result, [she] was harmed," id.[14]

_____

13 Plaintiff thus cannot rely on the Second Amended Complaint's unverified allegation that jail medical staff "would put Refused everytime [sic] they didn't change [Plaintiff's bandage]" (Docket Entry 20-1 at 4), despite the fact that she "never [r]efused" (id. at 8). See Legg v. Southern Health Partners, Civ. No. 1:12-481, 2013 WL 474804, at *3 (D.S.C. Feb. 7, 2013) (unpublished) ("reject[ing] as unreasonable the unsupported allegations that medical personnel . . . fabricated Plaintiff's medical records"), aff'd, 552 F. App'x 205 (4th Cir. 2013). In any event, Plaintiff has come forward with no evidence that Defendants knew or should have known of any such activity.

14 As noted in the Introduction, the Second Amended Complaint does not specify the capacity in which Plaintiff seeks to impose liability on Defendant Norwood. (See Docket Entry 20-1 at 2.) Because (for reasons discussed above) Plaintiff cannot establish any constitutional violation in this case, any official-capacity claim against Defendant Norwood cannot succeed. See Waybright v. Frederick Cnty., 528 F.3d 199, 203 (4th Cir. 2008) (concluding that
(continued...)

<u>CONCLUSION</u>

Even when viewed in Plaintiff's favor, the record establishes that the claims against Defendants in the Second Amended Complaint fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the instant Motion (Docket Entry 43) be granted and that summary judgment be entered in favor of Defendants on Plaintiff's claims against them.

<u>/s/ L. Patrick Auld</u>
**L. Patrick Auld**
**United States Magistrate Judge**

June 18, 2024

---

14(...continued)
official-capacity liability cannot attach "under [Section] 1983 without some predicate constitutional injury at the hands of the individual [acting on behalf of the governmental entity], at least in suits for damages" (internal quotation marks omitted)).